*Decision will be entered under Rule 50.*

HARRY C. PORTER, TRANSFEREE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ESTATE OF ROBERT P. PORTER, JR., DECEASED, TRANSFEREE, S. HOLT McALONEY AND FERN W. PORTER, COEXECUTORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2084–66, 2085–66. Filed December 13, 1967.

*William C. Schaab*, for the petitioners.
*Frederick B. Strothman*, for the respondent.

210

216

OPINION

Petitioners contend that at the date of her death Alice owned merely a chose in action or a claim against Porter for her interest in the community property standing in Porter's name at the date of their divorce. Petitioners refer to section 22–7–22 of the New Mexico Statutes Annotated which provides as follows:

The failure to divide the property on divorce shall not affect the property rights of either the husband or wife, either may subsequently institute and prosecute a suit for division and distribution thereof, or with reference to any other matter pertaining thereto, which could have been litigated in the original suit for divorce.

It is petitioners' position that it is the value of this claim at the date of Alice's death which is the property she owned which is includable in her gross estate for the purpose of determining her estate tax liability, if any, and that the value of the claim did not exceed the $60,000 exclusion.[3]

Respondent determined that the following assets were owned by Alice at the date of her death and are includable in her gross estate at their value as of that date:

875 shares of Porter & Sons,
A one-half interest in certain warehouse property,
A one-half interest in the Church Street property,
The diamond ring, household goods and $40 in cash.

We do not agree with petitioners that because under New Mexico law Alice could have instituted a suit for division of the community property held by her and Porter at the date of their divorce, she owned at the date of her death only a chose in action or claim against Porter. The statute specifies that Alice retained the right to institute a division suit, specifically stating that failure to divide property on divorce "shall not affect the property rights of either the husband or wife." Therefore, Alice at the date of her death had not lost any rights to property which she had at the time of her divorce. Under New Mexico law when Alice and Robert were divorced they became tenants in common of all the property which had just prior to their divorce been community property. The interest of the wife in community

---

[3] The diamond ring of a value of $800, household goods of a value of $1,000, and $40 cash are not in controversy.

property under the community-property law of New Mexico is a present, existing interest, not a mere expectancy. *Arnett* v. *Reade*, 220 U.S. 311 (1911), and *In re Stutzman's Estate*, 57 N.M. 710, 262 P. 2d 990 (1953).[4] The dissolution of the marriage by divorce, without division of the property, leaves the parties "as tenants in common." *Jones* v. *Tate*, 68 N.M. 258, 360 P. 2d 920 (1961), and *In re Miller's Estate*, 44 N.M. 214, 100 P. 2d 908 (1940).

The facts show that Alice during her lifetime never sought a transfer to her name of any property held in Porter's name at the time of their divorce but that shortly after her death Harry and Robert took the position that because the property was community property prior to the divorce she did own an undivided interest in it at the time of her death and that as her heirs they were entitled to her interest in that property after her death. So far as this record shows, neither Porter nor anyone on his behalf ever contended that to the extent he and Alice owned community property at the date of their divorce, Alice did not own from the date of the divorce until her death a tenancy-in-common interest in that property. All persons concerned with the subsequent litigation apparently recognized that Alice at the date of her death owned an undivided interest as a tenant-in-common in all community property which she and Porter had owned at the date of their divorce. In fact, it is because the husband and wife upon divorce become tenants in common with respect to property held by them as community property prior to divorce, that a suit for division is a proper action. A suit for division can be maintained only by an owner of an undivided interest in property. It was rather Porter's contention that at the date of their divorce, he and Alice owned no community property.

Porter contended that all the property held in his name at the time he and Alice were divorced was his separate property. He instituted a suit against Harry and Robert for a declaratory judgment that neither Alice nor her heirs, Harry and Robert, had any interest in the property held in his name at the date of divorce alleging that all such property was his separate property. The question was litigated and the Supreme Court of New Mexico held in *Porter* v. *Porter*, 65 N.M. 14, 331 P. 2d 360, 364 (1958), that "all property, real and personal, on hand and undivided at the time of the divorce was community property." At the date of Alice's death, it was known that she had an undivided interest in property which had been community property prior to the divorce. It was not known that litigation would arise over Alice's property interests. When this litigation was commenced, its outcome was uncertain. This uncertainty was concluded insofar as the

---

[4] We are not here concerned with the lack of testamentary power in the wife as to community property if she predeceases her husband where they are still married and living together at the time of her death. Sec. 29–1–8, N.M. Stat. Ann.

ownership of the property was concerned by the decision of the highest court of New Mexico. The decision of the New Mexico Supreme Court determined that all property standing in Porter's name when he and Alice were divorced was community property, thus settling this question, not only for the purposes of the litigation between Porter and Harry and Robert, but also for Federal estate tax purposes. *Commissioner* v. *Estate of Bosch*, 387 U.S. 456 (1967).

Petitioners argue that the Supreme Court of New Mexico did not determine that Alice owned an interest in any property but merely that Porter had failed to prove she did not. This is an incorrect interpretation of the holding of the Supreme Court of New Mexico. The law of New Mexico creates a presumption that all property acquired during coverture is community property. *Strong* v. *Eakin*, 11 N.M. 107, 66 Pac. 539 (1901). Therefore, when Porter failed to prove that the property was his separate property under this presumption she owned, as the Supreme Court of New Mexico found, an undivided interest in property even though the court did not state what specific property should be awarded in the division to Alice's heirs but left that to an accounting. However, this does not mean that that court did not determine that Alice had an undivided interest in property. We will later discuss the effect to be given to the final decree of the District Court of Dona Ana County entered July 26, 1961.

Here, the Supreme Court of New Mexico determined Alice's property interest as distinguished from the specific property which should be set aside to her estate in a division proceeding to satisfy that interest. If there had been no determination of the property interest made by the State court (now, under *Commissioner* v. *Estate of Bosch*, *supra*, by the highest court of the State), then the property interest which the decedent owned under the applicable State law would have been left to be determined by the Federal Court in which the estate tax issue is being litigated from the evidence before it. See *Austin Leigh Claiborne et al., Executors*, 40 B.T.A. 722 (1939). However, once this determination is made, it is the property determined to be owned by the decedent at the date of his death which is includable in his gross estate for the purpose of Federal estate tax and not merely a "chose in action" or "claim." See *Estate of Fletcher E. Awrey*, 5 T.C. 222 (1945); *Estate of William P. Metcalf*, 7 T.C. 153 (1946), affirmed per curiam (C.A. 6, May 5, 1947 (unreported)); *Estate of Theodore O. Hamlin*, 9 T.C. 677 (1947); *Estate of Ralph Rainger*, 12 T.C. 483, 488 (1949), affirmed per curiam 183 F. 2d 587 (C.A. 9, 1950), certiorari denied 341 U.S. 904; *Estate of Frank Hagenlocher*, 42 T.C. 1015 (1964); *Kirkpatrick* v. *Sanders*, 261 F. 2d 480 (C.A. 4, 1958); and *Dauphin Deposit Trust Co.* v. *McGinnis*, 324 F. 2d 458 (C.A. 3, 1963).

Petitioners cited certain cases dealing with the value of "claims" owned by a decedent at the date of his death. These cases deal with

claims or suits for money and are not comparable to the instant case. Also in none of those cases was there any issue between the parties as to the nature of the "property" or "interest" in property to be included in the decedent's estate. Both parties in those cases recognized that the "property" to be included was a "claim." The issue in each was only whether the claim had any value at the date of the decedent's death and, if so, the value of the claim. See *United States* v. *Simmons*, 346 F. 2d 213, 216 (C.A. 5, 1965), and cases there cited and discussed. In *Estate of A. Bluestein*, 15 T.C. 770 (1950), there existed a situation comparable factually to that here but involving the husband who held the property which was in fact later held by a State appellate court to be community property under claim that it was his own. Respondent included the value of the property he claimed to own at the date of his death in his gross estate but we held that only the community one-half which, about 5 years after his death, was determined by the State court to be his, was includable in his estate and included no amount because of his "claim" to the other portion which the State court held to belong to the heirs of his wife who died long before he did. In fact, insofar as we have been able to ascertain, none of the many cases dealing with whether or not a decedent owned an interest in property has held that the decedent owned merely a "claim" to such property and proceeded to value the "claim." Some have concluded the decedent did not own the property in dispute, *Estate of A. Bluestein*, *supra*, and therefore included no value with respect to it in the gross estate. Others have concluded that decedent did own at the date of death the interest in property or part of it and then considered the question of the "value" of the interest owned by decedent.

Section 811(a), I.R.C. 1939, provides that the value of the gross estate of a decedent shall include the value at the time of his death of all property to the extent of the interest of decedent therein. It is, of course, the interest owned at the time of death which must be valued. The decedent's interest in the property at the date of his death which is includable in his estate may, of course, be a partial or undivided interest. Merely because it is determined that the "interest" is an interest in property does not mean that when that interest is an undivided interest its value would necessarily equal that proportionate part of the full value of the asset in which the decedent had an undivided interest. See *Estate of Nina M. Campanari*, 5 T.C. 488 (1945), as to a discount to be applied from the proportion of the fair market value of the total property in valuing an undivided interest in real estate. See also *Estate of Arthur H. Hull*, 38 T.C. 512, 524 (1962), reversed on another issue 325 F. 2d 367 (C.A. 3, 1963), in which we referred to the doubt as to enforceability of a contract at the date of decedent's death as an element to consider in determining its value, and *Estate of Walter A. May*, 8 T.C. 1099, 1104 (1947), in which we valued an 18.125-percent

interest in a trust taxable as a corporation composed of real properties of a total fair market value of $270,000 at $25,000 and not its $51,160.22 proportionate share value partially because of there being an unfavorable long-term lease on one of the properties. Cf. *Estate of Burd Blair Edwards Dickson*, 13 T.C. 318 (1949).

In the present case Alice's interest was not only an undivided interest but was an interest in property held by Porter in his name only. Under these circumstances, there existed the definite possibility that the facts would develop as in fact they did that litigation would be necessary to settle the property interest. Certainly, if an admitted fractional interest requires that property not be valued at its proportionate share of the fair market value of the whole property, such an undivided interest which had not been admitted to exist by the person holding the property should be valued at a substantial discount from its proportionate share of value of the total property.

The parties stipulated the "gross estate" if the Court "finds for respondent." This stipulation is difficult to interpret. If by "finds for the respondent," the parties mean that we conclude that what is includable in Alice's gross estate is an interest in property as distinguished from a mere "claim" or "chose in action," as contended by petitioner, then we have "found for respondent." If by "finds for the respondent," the parties mean find that specific assets determined by respondent are the assets includable in Alice's gross estate, then we do not "find for respondent." What Alice owned at the date of her death was an undivided interest in all the property which she and Porter had held as community property at the time of their divorce, or the properties substituted therefor when such properties had been disposed of by Porter after their divorce and prior to Alice's death, plus her share of the increases in these properties by divisions or other growth, plus possibly her proportion of the net profits or gains resulting from the properties from the date of the divorce to the date of her death, less perhaps some adjustment for income taxes on such profits and gains which had been paid by Porter. This is not the property respondent included in Alice's estate in the notice of deficiency. Respondent included in Alice's estate 875 shares of stock of Porter & Sons and a one-half interest in the warehouse and Church Street properties. Under the decree entered July 26, 1961, Robert and Harry each received 595 shares of Porter & Sons stock and a one-half interest in the warehouse property and in addition received other property and cash.

We agree with petitioner that since this decree was entered as a result of a settlement among the parties, it is not binding on this Court as to the properties owned by Alice at the date of her death. In fact, the "interest" Alice owned at the date of her death was an undivided interest and even if the decree had not been the result of a settlement it would be clear from its contents that it did not

purport to distribute to Harry and Robert one-half in kind of the specific properties in which Alice had an undivided one-half interest at the date of her death. However, from the agreement of the parties, it might be inferred that by the stipulation they intended the stipulated amount of "gross estate" to be the value of Alice's entire gross estate if we found that she did own an "interest in property" and not merely a "claim" at the date of her death. Also, as discussed later in this opinion, the parties' intent with respect to this stipulation has an effect on the issue of deductibility of attorneys' fees and other litigation costs by Alice's estate.

Since the parties must have known their intent in entering into this stipulation, we will let them have the opportunity to apply that intent in a Rule 50 computation in accordance with our holding that Alice owned at the date of her death an undivided interest in the property and its increments which had been community property at the date of her divorce from Porter. If the stipulation is not applicable under our holding as to the property interest owned by Alice at the date of her death, then the parties may suggest such other action as they consider appropriate.

To value Alice's undivided interest, which at the date of her death was neither admitted nor contested, might result in substantially the same value as if Alice were considered to have merely a "chose in action" or "claim." However, from this record we would not agree that Alice's interest was less than $60,000 which petitioners contend to be the value of a "chose in action" or "claim" at the date of her death. To value her interest, we would need to know the value of all property in which Alice owned an interest at the date of her death. This would not necessarily be the properties which Harry and Robert ultimately recovered. In addition to the properties held by Porter both at the date of divorce and the date of Alice's death, it would include an amount to replace or represent the value of the properties owned by Alice and Porter at the date of the divorce but disposed of by Porter between that time and the date of Alice's death, and it might also include the value of the income or "interest" on Alice's undivided interest from the date of the divorce to the date of her death, no amount with respect to which was awarded to Harry and Robert in the final decree resulting from the settlement of the parties on the theory of these rights being barred by "limitations and laches." At the date of her death Alice had an undivided interest in items which are not among the specific items of property ultimately awarded to Harry and Robert.

The failure on the part of petitioners to establish facts sufficient to permit a proper determination of the fair market value of the undivided interest in property which Alice owned at the date of her

death might be considered to require the conclusion that respondent's determination shall be sustained for failure of proof on the part of petitioners had this case been presented to the Court other than under a stipulation which to us leaves the intent of the parties unclear. The only specific reference in the record to the value at the date of her death of Alice's tenancy-in-common interest in the property which she and Porter had held as community property prior to their divorce is a statement by one of petitioners' lawyer witnesses in his testimony by deposition that $50,000 represented about 10 percent of its value. There is no explanation of how this speculation that Alice's undivided interest in such property had a value at the date of her death of about $500,000 was arrived at, but we must assume that this off-hand estimate of value referred to one-half of the value of what this witness considered to constitute the specific assets in which Alice had an undivided interest at the date of her death since this speculation as to value was followed by the further speculation that Alice's "claim" had possibly a 25-percent chance of being sustained. This lawyer was a member of the firm that had represented Porter in the litigation. The record fails to show how this "value" of $500,000 was arrived at or whether in this amount was included Alice's interest in the amounts received for property which had been disposed of by Porter between the date of the divorce and the date of Alice's death and the profits and gains on her interest in the properties from the date of the divorce to the date of her death which had, as had the property itself, been retained by Porter. Since the record reflects that during the litigation up until the time of the decision of the Supreme Court of New Mexico, the major concern of the parties focused on the stock of Porter & Sons and the control of the corporation, we would hesitate to speculate as to the "property" this witness as considering when he made this off-hand reference to $50,000 representing 10 percent of Alice's "claimed" interest. Another difficulty with this record, if the parties intended any issue of the value of Alice's tenancy-in-common interest in property to be involved, is that not only is there no reference to the fair market value of the stock of Porter & Sons or any other property at the date of Alice's death, but also the clear inference from the record is that every reference to the value of this stock at various other times is to its book value which may or may not be its fair market value. When the nature of the business of this corporation is considered and the fact that customer contracts which most likely were intangible assets without a book value were such an important part of that business, we would be totally unwilling to speculate that the fair market value of the stock of Porter & Sons and the book value of that stock were the same.

We might add that we would have the same difficulty with the lack

of proof of fair market value of the assets in which Alice owned a tenancy-in-common interest at the date of her death, were we to attempt to value Alice's interest as a "claim." Petitioners have made no effort to show such value but rather ask us to find that no matter what that value, Alice's "claim" has no value. We are asked to make this determination on the basis of the testimony of three lawyers. One of these lawyers represented Harry and Robert throughout the proceedings and gave Harry the impression after the decision of the trial court that he and Robert had a 50-percent chance of success in the Supreme Court. Yet in his deposition offered in this case he testified that even before he tried the case in the trial court he thought that Alice's "claim" had no value. One of the other lawyers was a member of the firm who handled the case for Porter and lost it. We have previously discussed his testimony to some extent. This lawyer showed a not uncommon inclination of one convinced against his will "to be of the same opinion still." We give no weight to his testimony. The third lawyer had read part of the record presented in this case by stipulation which record we have read in full. We, therefore, consider that we are in a better position to judge the value of Alice's so-called claim than this lawyer and we find a total lack of sufficient evidence in the record to make a considered determination of its value.

From the record in this case we would not consider that at the date of her death, Alice's chances or those of her estate of obtaining a division of the property she owned jointly with Porter, so that one-half would be distributed to her estate, were nominal. From the record we consider that she had far more than a nominal chance of obtaining her one-half of the properties. We are not at all persuaded to the contrary by the opinions given by the three lawyers who testified by deposition for petitioners. See *Estate of Burd Blair Edwards Dickson, supra.* See also as to evidence necessary to overcome the presumption that property acquired during coverture in New Mexico is community property *Campbell* v. *Campbell*, 62 N.M. 530, 310 P. 2d 266 (1957). We are aware that in addition to the value of all assets in which Alice had an undivided one-half interest at the date of her death (which this record does not show) and the chance of having to litigate with questionable results to obtain division, the cost of such litigation would have to be considered in determining what the fair market value of Alice's interest at the date of her death would be. However, if this factor is to be considered in valuing Alice's interest in the property, the parties apparently consider that the amount of such expenses should not be deductible by the estate. To then allow such a deduction would in effect give credit for such costs and expenses twice.

As we view the record, no issue in this respect exists. At the date of Alice's death there existed the presumption under New Mexico law

that all property held at the date of her divorce which had been acquired during the 31 years she was married to Porter was community property. From the transcript of the testimony in the State trial court, particularly the testimony of Porter, we would not have reached the same conclusion as to Porter's having proved that all this property was his separate property as was reached by the trial court without giving any consideration to whether the Deadman's Statute was applicable.

We therefore conclude that even if we were to view Alice's interest as a "claim," the prime factor needed to value this "claim," namely, the "fair market value of the property" to which she had a claim at the date of her death, is not shown in the record. However, there may exist no issue of "burden of proof" in this case. As we have heretofore stated, the parties have entered into a stipulation as to Alice's "gross estate" which they may intend to eliminate such an issue.

During the course of their litigation with Porter, Harry and Robert incurred legal expenses of $28,609.88 and $59,324.54, respectively, travel expenses of $529.56 and $6,094.36, respectively, and Robert incurred accounting expenses of $22,883.10, making a total of $117,441.44. Petitioners contend that if the agreed "gross estate" value is the amount of Alice's gross estate, these expenses are deductible by Alice's estate as expenses of administration under section 812(b), I.R.C. 1939, because they were incurred "in the collection of assets." Sec. 81.32, Regs. 105. If we assume that attorneys' fees and other litigation costs were not a discounting factor in valuing Alice's undivided property interest at the date of her death, then it is necessary to consider the deductibility of these expenditures by the estate. Since petitioners did not contend that these fees and costs were deductible if all Alice owned at the date of her death was a "chose in action" or "claim," we consider that they are not contending that if such litigation costs are considered. in valuing Alice's interest in property at the date of her death, these amounts should also be deductible from the gross estate. This issue, as we view it, arises only if the value of Alice's property interest is not discounted because of such anticipated costs. Again, we do not consider the stipulated facts to be clear.

Respondent argues that the expenses are not deductible by the estate because petitioners incurred them for their own benefit and not for the benefit of the estate and that since these expenses have not been approved by the court having jurisdiction over the estate they are not shown to be "allowable" expenses.

Expenses which are "actually and necessarily" incurred in the administration of the estate, "in the collection of assets * * * and distribution among the persons entitled" thereto are deductible from the gross estate in computing the net estate subject to taxation. However, "Expenditures not essential to the proper settlement of the estate, but incurred for the individual benefit of the heirs * * * may not be taken

as deductions." Sec. 81.32, Regs. 105. The regulations provide specifically with respect to attorney's fees that such fees are not deductible if "incurred by beneficiaries incident to litigation as to their respective interests." Sec. 81.34, Regs. 105.

In the litigation undertaken by Harry and Robert in the instant case, assets of the estate were collected. The litigation did not relate to settlement of the "respective interests" of the beneficiaries. There was never any question as to the interest owned by Harry or Robert in Alice's estate. Each had a one-half interest. The issue throughout the litigation was what assets belonged to the estate of Alice. The fact that some benefit results to the beneficiaries from an expenditure is not a reason to disallow the expense as a deduction, especially where, as here, the collection of assets affects all beneficiaries equally and not one over others. See *Estate of Christine Swayne*, 43 T.C. 190 (1964), and *Dulles v. Johnson*, 273 F. 2d 362 (C.A. 2, 1959).

Since the expenses have not been actually allowed by the New Mexico court having jurisdiction over Alice's estate, we must determine whether under the laws of that State they are allowable. These expenses were incurred, at least partially, before letters of administration were granted. No administration of the estate was sought until 1959. However, this is not a bar to allowance of the deduction by the estate if they are allowable under State law. *James D. Bronson et al., Trustees*, 7 B.T.A. 127 (1927), affd. 32 F. 2d 112 (C.A. 8, 1929).

Under New Mexico law all expenses necessary to the "care, management, and settlement of the estate" are allowable "including reasonable attorney fees." N.M. Stat. Ann. sec. 31–12–10.[5] This statute, as the New York statute involved in *James D. Bronson et al., Trustees, supra*, is sufficiently broad to permit allowances of fees for services incurred prior to appointment of an administrator where the litigation was "necessary" as it was in this case and the expenses are reasonable. In view of the difficult and protracted litigation in this case and the distance of Robert's residence in New York from the place of litigation, the fees and expenses incurred by Harry and Robert appear reasonable in amount. In fact respondent does not contend to the contrary. The fees and expenses are of the nature allowable under New Mexico law. We conclude that the fees and expenses are reasonable under the circumstances of this case and that they are "allowable" under New Mexico law. Petitioners are not required to show

[5] Sec. 31–12–10. Expenses and attorney fees—Compensation of executor or administrator.—An executor or administrator shall be allowed, in the settlement of his accounts, all necessary expenses incurred in the care, management, and settlement of the estate, including reasonable attorney fees in any necessary litigation or matter requiring legal advice or counsel. * * *

Sec. 31–10–4, N.M. Stat. Ann., provides for the amount of attorney's fees in "conducting of ordinary probate proceedings," but does not preclude additional fees under sec. 31–12–10 above quoted.

that the fees have been allowed by the State court but merely that they are allowable under State law. *Estate of Charles M. Prell, Sr.*, 48 T.C. 67 (1967), on appeal (C.A. 6, July 19, 1967). We, therefore, hold that if attorneys' fees and other litigation costs have not been considered as a discounting factor in determining the value of Alice's undivided interest in property held at the date of her death, the entire $117,441.44 expended by Harry and Robert in their litigation with Porter is deductible as administrative expenses in computing the estate tax liability for Alice's estate.

Respondent determined in his notice of deficiency that "since no estate tax return was filed," petitioners are liable for an addition to tax equal to 25 percent of the tax due "in accordance with the provisions of section 291(a) of the 1939 Code." Petitioners contend that their belief that the gross estate of Alice was less than the amount of $60,000 was reasonable cause for failure to file an estate tax return.

Section 291(a), I.R.C. 1939, provides an addition to tax ranging from 5 percent to 25 percent for failure to file an income tax return on time. The addition is applicable unless the failure to file is shown to be due to "reasonable cause and not due to willful neglect." However, section 291(a) does not apply to an estate tax return. Section 840 provides that the provision of section 3612(d)(1), I.R.C. 1939, is applicable to the filing of estate tax returns. This section provides for the additions to tax for failure to file a return or to timely file a return "except that when a return is filed after such time" a showing of reasonable cause and no willful neglect will cause the addition to tax not to apply. Section 3612(d)(1), I.R.C. 1939, has been interpreted to mean that reasonable cause is a defense only when a return was filed at some late date. *Chas. F. Roeser*, 2 T.C. 298, 305 (1943).

Since no return was ever filed for Alice's estate, respondent's determination of the addition to tax must be sustained under section 3612(d)(1), I.R.C. 1939, unless petitioners are entitled to show "reasonable cause" for failure to file any estate tax return for Alice's estate because of respondent's reference to the wrong section of the statute in his notice of deficiency. Since there was no evidence petitioners could have offered to refute the addition to tax if respondent had relied on the correct section of the Code, petitioners have not been harmed by his relying on the incorrect section and therefore his reference to section 291(a), I.R.C. 1939, is no reason for holding for petitioners even had they shown "reasonable cause" for failure to file any return for Alice's estate. However, they have not shown such reasonable cause. Under the facts here and the position Harry and Robert were taking as to the ownership of property by Alice at the date of her death, there appears to have been no reasonable cause for not filing a timely estate tax return for Alice's estate even if it were

necessary to give only a tentative value to the estate pending the outcome of the litigation. However, at least after the decision of the Supreme Court of New Mexico in 1958, it would have been possible to file a reasonably accurate return for Alice's estate but none was filed. We, therefore, conclude that petitioners have failed to show any reasonable cause for failure to file any estate tax return for Alice's estate.

We sustain respondent in his determination of additions to tax for failure to file an estate tax return.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

RAUM, *J.*, concurring: I think the question whether the decedent had an "interest" in the property as against a "chose in action" or a "claim" against her former husband is a false issue. Whether her rights are labeled an interest in property rather than a claim or a chose in action, it was at best an interest that was under a cloud. The property was in fact in her former husband's name, and he was asserting full rights of ownership in respect thereof. Indeed, the lower court in New Mexico subsequently found that it was his separate property, and the contrary ruling by the Supreme Court of New Mexico was based essentially upon a technical application of the rules of evidence.

What goes into decedent's gross estate is the value of her rights at the time of her death, namely, what a willing buyer would have paid for her unestablished interest at that time—an amount that is without doubt substantially less than the value of that interest computed as though it were uncontested or had already been established.

Although I read the majority opinion as reaching this result, there may be language therein that could cast doubt upon the matter, and I therefore think that it should be made explicit beyond any ambiguity.

DAWSON, TANNENWALD, and SIMPSON, *JJ.*, agree with this concurring opinion.